**Kathryn L. HALL, Plaintiff,**

v.

**Carolyn W. COLVIN, Acting Commissioner, Social Security Administration, Defendant.**

**C.A. No. 13–169–M.**

United States District Court,
D. Rhode Island.

Signed May 8, 2014.

---

Stephen P. Maguire, Cranston, RI, for Plaintiff.

Leslie J. Kane, U.S. Attorney's Office, Providence, RI, for Defendant.

## MEMORANDUM AND ORDER

JOHN J. McCONNELL, JR., District Judge.

This matter is before the Court for review of the Administrative Law Judge's ("ALJ's") decision denying an application for supplemental security income ("SSI") submitted by Kathryn L. Hall. Ms. Hall filed her SSI application on March 9, 2009, claiming a disability onset date of January 17, 1976. Trans. 20.[1] Ms. Hall alleges to suffer from cerebral palsy, depressive disorder, anxiety disorder, a personality disorder, obesity, and asthma. *Id.* at 22. Her SSI application was initially denied and again denied after reconsideration. *Id.* at 75, 81.

Ms. Hall requested a hearing before an ALJ and that hearing took place on No-

vember 9, 2011. *Id.* at 38–70; 84. Ms. Hall, represented by counsel, appeared and testified, as did a vocational expert. *Id.* at 38–70. Subsequently, the ALJ determined that Ms. Hall was not disabled during the relevant time period. *Id.* at 31–32. Ms. Hall appealed to the Appeals Council, but her request was denied. *Id.* at 1–6; 15–16. Ms. Hall then appealed to this Court. (ECF No. 1.)

Ms. Hall requests relief under sentence four of 42 U.S.C. § 405(g), seeking to reverse and remand the ALJ's decision. (ECF No. 5.) Ms. Hall contends that she was not "provided a fair non-adversarial hearing" and the ALJ's decision contains errors of law and its factual findings are not supported by substantial evidence in the record. (ECF No. 10 at 1; ECF No. 5 at 1.) Carolyn W. Colvin, Acting Commissioner of Social Security (the "Commissioner"), has moved for an affirmance of the ALJ's decision "because substantial evidence supports the Commissioner's finding that [Ms. Hall] was not disabled during the relevant time period." (ECF No. 8 at 1.)

## I. STANDARD OF REVIEW

"Judicial review of Social Security administrative determinations is authorized by 42 U.S.C. § 405(g) (1994)." *Seavey v. Barnhart,* 276 F.3d 1, 8 (1st Cir. 2001). "The ALJ's findings of fact are conclusive when supported by substantial evidence, 42 U.S.C. § 405(g), but are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." *Nguyen v. Chater,* 172 F.3d 31, 35 (1st Cir.1999) (citing *Da Rosa v. Sec'y of HHS,* 803 F.2d 24, 26 (1st Cir.1986) (per curiam); *Ortiz v. Sec'y of HHS,* 955 F.2d 765, 769 (1st Cir. 1991)). Federal courts have "the power to

---

1. "Trans." refers to the "Transcript of Proceedings" filed in this matter.

remand cases to the Commissioner" under the fourth and sixth sentences of § 405(g). *Seavey,* 276 F.3d at 8. "The fourth sentence of this subsection states that a reviewing court 'shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.'" *Id.* (quoting 42 U.S.C. § 405(g)). The First Circuit has explained that if "an essential factual issue has not been resolved . . . and there is no clear entitlement to benefits, the court must remand for further proceedings." *Seavey,* 276 F.3d at 11.

## II. THE MEDICAL EVIDENCE

The record contains evidence of Ms. Hall's numerous visits to doctors and treatments from August 2008 through October 2011. Trans. 184–433. This Court will provide a chronological summary of the relevant medical evidence.

Ms. Hall met with psychologist John Parsons, Ph.D., six times between April 8, 2009 and August 18, 2009. *Id.* at 198. These evaluations were recommended by the Department of Children, Youth and Families due to concerns about Ms. Hall's ability to parent safely and effectively. *Id.* Dr. Parsons diagnosed Ms. Hall with the following clinical syndromes: major depressive disorder, moderate, recurrent; generalized anxiety disorder; physical abuse of child as a victim; physical abuse of adult as a victim; and neglect of child. *Id.* at 213. He noted that Ms. Hall had problems with her primary support group; occupational problems; economic problems; and problems related to the interac-

tion with the legal system. *Id.* Dr. Parsons diagnosed Ms. Hall with a GAF[2] score of fifty, the highest it had been in the past year. *Id.* at 214. He also recommended that Ms. Hall have "consistent outpatient psychotherapy" and "a psychiatric evaluation to determine her need for psychotropic medications." *Id.*

On September 8, 2009, Ms. Hall met with Jocelyn Kreiss, M.D. *Id.* at 224. This "consultative examination was for the sole purpose of assessing the presence of mental impairments such that these impairments hamper her ability to work and complete tasks of daily living." *Id.* Dr. Kreiss diagnosed Ms. Hall with a non-specified depressive disorder and assigned her a GAF score of sixty. *Id.* at 227–28. Dr. Kreiss stated that Ms. Hall "would benefit from continued outpatient counseling on a regular basis." *Id.* at 228.

A few days later, on September 16, 2009, Ms. Hall underwent an annual assessment update at the East Bay Center and was examined by Cheryl Andrade, LMHC, LCDP, CGAS, CCDP–D. *Id.* at 246–51. The update noted that Ms. Hall is a "[v]ery dependent individual due to limited training in life skills and significant repression/abuse." *Id.* at 249. Ms. Hall was diagnosed with adjustment disorder with mixed anxiety and depressed mood; she was assigned a GAF score of fifty-five. *Id.* at 246.

Adam J. Cox, Ph.D. conducted a disability evaluation of Ms. Hall on April 20, 2010. *Id.* at 293. Dr. Cox stated that Ms. Hall's "affect was tearful, sometimes to the extent of finding it hard to talk. Her mood was depressed." *Id.* at 295. Dr. Cox noted that Ms. Hall's "focus and memory are

---

**2.** The ALJ explained that "[t]he GAF score is a clinician's rating, of an individual's overall psychological, social and occupational functioning, on a scale of 0 to 100. A rating of 50 indicates serious symptoms . . . or any serious impairment in social, occupational, or school functioning." *Id.* at 27 (citing *Diagnostic & Statistical Manual of Mental Disorders,* 4th Ed., Text Revision pg. 34 (2004)).

impaired due to stress, depression, and frequent emotional dysregulation." *Id.* He also noted that "the claimant gives the impression of being preoccupied with depression and anger to an extent that problem solving and goal-directed action are essentially beyond her capability." *Id.* Dr. Cox diagnosed her with major depressive disorder, recurrent; dependent personality disorder; and cerebral palsy. *Id.* He assigned her a GAF score of forty. *Id.*

On May 21, 2010, Joseph Litchman, Ph. D., a state agency reviewing psychologist, conducted a psychiatric review of Ms. Hall. *Id.* at 297–314. He opined that Ms. Hall had mild limitations in activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. *Id.* at 307. Dr. Litchman had medical records from Dr. Kreiss, Dr. Parsons, Dr. Cox, and the East Bay Center. *Id.* at 309. Dr. Litchman concluded that Ms. Hall has the ability to sustain attention and concentration for two hour spans in and eight hour day "in simple 1+2 step tasks" and could sustain this schedule. *Id.* at 313. He also stated that Ms. Hall "would be able to handle supervisory oversight in simple tasks" and "to set minor goals effectively." *Id.* Dr. Litchman was the last state agency physician to review Ms. Hall's condition.

Two months later, on July 9, 2010, Ms. Hall visited Felicia Meila, M.D., for an annual physical exam. *Id.* at 344–45. Ms. Hall presented as withdrawn, tired, and fatigued. *Id.* at 344. She felt "more irritable, more snappy and 'not quite herself' " and reported not sleeping well. *Id.* Dr. Meila was concerned about several facets of Ms. Hall's health. *Id.* at 345. Dr. Meila prescribed Ms. Hall medication for her depression and recommended she see a counselor. *Id.* She discussed her recent weight gain and advised her on diet and exercise. *Id.* She also referred her to a sleep study for her sleep apnea. *Id.*

Per the recommendation of Dr. Meila, Ms. Hall saw Christine P. Stinson, MA, LMHC, a psychotherapist, on August 5, 2010. *Id.* at 354–61. Ms. Stinson's initial evaluation records indicate that Ms. Hall was depressed, fatigued, and did not sleep well. *Id.* at 358. A mental status examination revealed thoughts of inadequacy/worthlessness; hopelessness; pessimism/negativity; anxious and worried; low self-esteem; racing thoughts, and decreased interests. *Id.* at 360. That examination also showed that both her judgment and her insight were moderately impaired. *Id.* at 360. Ms. Stinson diagnosed Ms. Hall with major depressive disorder, recurrent (296.32); an eating disorder (307.50); and generalized anxiety disorder (300.02). *Id.* at 361.

During a visit to Ms. Stinson, on September 14, 2010, Ms. Hall reported that she taken tests for attention deficit disorder. *Id.* at 375. Ms. Stinson observed Ms. Hall as moody and distracted, having difficulty concentrating, crying a lot, and increased rage, as well as helplessness and hopelessness. *Id.* at 375.

Dr. Meila also referred Ms. Hall to Jessica Somerville Ruffolo, Ph.D., for a Neuropsychological Evaluation due to her memory loss problems. *Id.* at 362, 363. On January 31, 2011, Ms. Hall saw Dr. Ruffolo, and during her appointment, Ms. Hall received a phone call from her current boyfriend who was so verbally abusive toward her that Dr. Ruffolo had stop the testing and transition into a therapeutic session. *Id.* at 363. Dr. Ruffolo recommended that Ms. Hall "return for neuropsychological testing following further treatment for her severe depression," and expressed concern about Ms. Hall's "worsening memory," lack of motivation, and

"increased emotional outbursts." *Id.* at 364.

Ms. Hall began treatment for depression on March 11, 2011 with Diane Brousseau–Pizzi, APRN, a psychiatric nurse. *Id.* at 392. Nurse Brousseau–Pizzi diagnosed Ms. Hall with very severe social phobia/performance anxiety and major depressive disorder, recurrent, moderate; she assigned a GAF score of forty-five. *Id.* at 399. Nurse Brousseau–Pizzi noted that Ms. Hall's judgment was poor and she was impulsive. *Id.* at 397.

## III. THE HEARING

On November 9, 2011, Ms. Hall, represented by counsel, had a hearing before an ALJ. *Id.* at 38–70. She testified as to her physical and mental impairments. *Id.* at 42–57. The only other testimony was that of a vocational expert, who answered hypothetical questions posed by the ALJ, as well as questions posed by Ms. Hall's attorney. *Id.* at 56–69. Most notably, and critical to Ms. Hall's argument, no medical expert testified.

Ms. Hall testified that she does not have any problems sitting, standing, or walking; however, she does suffer from cerebral palsy and cannot lift objects that weigh more than ten pounds. *Id.* at 44. Due to her cerebral palsy, she has difficulties with fine manipulation, including difficulties writing, cutting food and opening jars. *Id.* at 44–45. Ms. Hall explained that she does not have problems stooping, squatting, or kneeling, but does have difficulties climbing stairs. *Id.* at 45.

Ms. Hall also testified as to her mental impairments. She stated that she has problems in crowds, has difficulty handling stress, and would have problems with pressure at work. *Id.* at 45. Moreover, she explained that she is easily upset when she is criticized, and either gets defensive or cries. *Id.* at 55. This happens more than once a week. *Id.* Ms. Hall further testified that she suffers from memory loss, experiences problems concentrating and focusing, and would have trouble getting along with coworkers due to her anxiety, depression, and personality disorder. *Id.* at 46. She also stated that she would have problems performing complex tasks. *Id.*

Ms. Hall lives with her mother and her three sons, ages thirteen, eleven and three. *Id.* at 42, 47. She explained that she tries to do basic household chores, but chores are a source of fights between her and her mother because Ms. Hall regularly forgets to do her chores or does not complete them. *Id.* at 47, 50. She explained that she does not go to church, have hobbies, or belong to any clubs or social organizations. *Id.* at 48. She spends her days with her three-year-old, and is trying to toilet train him. *Id.* at 49. Ms. Hall said that she will walk with her son around the neighborhood, but she will not talk to anybody. *Id.* The father of her two oldest sons used to live with Ms. Hall, but she asked him to move out because he was verbally and emotionally abusive. *Id.* at 51. Ms. Hall explained that she gave birth to her third son in her bathroom, one week after she learned she was pregnant. *Id.* at 52. Her third son was about three months premature. *Id.*

After Ms. Hall's testimony, a vocational expert testified. *Id.* at 58–69. The ALJ inquired about Ms. Hall's employment history and then posed hypothetical questions to the vocational expert. *Id.* at 58–69. The first hypothetical was based on a credible finding of Ms. Hall's testimony and her limitations, and asked what jobs, if any, could she perform. *Id.* at 58. The vocational expert responded that "those limitations would not allow for any type of sustained competitive employment." *Id.* The second hypothetical was based on the

state agency physician's assessments. *Id.* at 59. The ALJ asked the vocational expert to assume that an individual with Ms. Hall's education and work experience could life heavy objects, perform repetitive pushing, and climb ladders, among other things, on a sustained basis during an eight hour day, in an environment with limited personal interaction and no more than simple decision making. *Id.* The vocational expert explained that a person with those capabilities and limitations could not perform any past relevant work. *Id.* at 60. The vocational expert said that such an individual could work as a dietary aide or house keeper, or at some positions in a manufacturing environment. *Id.* During examination by Ms. Hall's counsel, the vocational expert testified that if a person is incapable of accepting criticism or redirection, then they would be "unlikely able to maintain employment." *Id.* at 69.

## IV. THE ALJ'S DECISION

In the ALJ's decision, issued on December 6, 2011, he engaged in the five-step sequential evaluation process to determine whether Ms. Hall was disabled pursuant to 20 C.F.R. 416.920(a)(4).[3] *Id.* at 20–32. Among other things, the ALJ found the following:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 C.F.R. 416.967(c) except she can only occasionally perform pushing and pulling and fine manipulation (fingering) with her right hand. She can

occasionally climb ladders, ropes, or scaffolding. She is unable to tolerate extreme cold, humidity, concentrated fumes, odors, gases, dust, or poor ventilation. The claimant is able to perform simple, routine, competitive, repetitive tasks on a sustained basis over a normal 8–hour workday, in a stable work environment, no more than simple decision-making, no significant close interpersonal interactions with co-workers (no teamwork), and no significant interaction with the public. Finally, she is unable to perform complex and detailed tasks.

Trans. 25. The ALJ did not have a medical expert testify at the hearing. *Id.* at 68. In his decision he found that the opinion of state agency consultant "Dr. Litchman was fully consistent with the medical evidence." *Id.* at 29. The ALJ gave "great weight to the opinion of Dr. Litchman to the extent that it is consistent with the residual functional capacity indicated above." *Id.*

The ALJ recognized that Ms. Hall was not able to perform past relevant work, but found that she "is capable of making a successful adjustment to other work that exists in significant numbers in the national economy." *Id.* at 29, 31. The ALJ concluded that Ms. Hall had not been under a disability since March 9, 2009, the date her application was filed. *Id.* at 31.

## V. ANALYSIS

Ms. Hall argues that the ALJ's decision was not supported by substantial evidence because the ALJ erred in four ways.

---

**3.** Section 416.920(a)(4) provides

The five-step sequential evaluation process. The sequential evaluation process is a series of five "steps" that we follow in a set order.... If we can find that you are disabled or not disabled at a step, we make our determination or decision and we do not go on to the next step. If we cannot find that

you are disabled or not disabled at a step, we go on to the next step. Before we go from step three to step four, we assess your residual functional capacity.... We use this residual functional capacity assessment at both step four and at step five when we evaluate your claim at these steps.

(ECF No. 5–1; ECF No. 10.) First, the ALJ erred by failing to have a medical expert testify and, instead, interpreted the medical evidence himself. Second, the ALJ improperly relied on GAF scores to discredit medical evidence. Third, the ALJ erred by giving great weight to Dr. Litchman's evaluation because it was based on an incomplete record as it did not include the most recent and relevant medical evidence. Fourth, the ALJ did not consider *all* the relevant medical evidence in the record.

The Commissioner counters that the ALJ fully developed the record and his decision is supported by substantial evidence. (ECF No. 8.) Specifically, the Commissioner argues that because GAF scores are not raw medical data, a medical expert was not required.

### A. Expert Medical Testimony

Ms. Hall contends that medical expert testimony was required because the ALJ made medical judgments on issues that are beyond the kin of a layperson: "It is fundamentally unfair to allow a lay person like the ALJ [to] interpret medical evidence and provide his own uneducated guess as to the meaning and validity of the GAF scores that appear in the record." (ECF No. 5–1 at 5.) The Commissioner counters that GAF scores are not raw medical data, and therefore, do not require the testimony of a medical expert to clarify their meanings. (ECF No. 8 at 12.) This Court finds Ms. Hall's argument persuasive.

 The factual findings of an ALJ are not conclusive if they are "derived by … judging matters entrusted to experts." *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir.1999). "With a few exceptions … an ALJ, as a lay person, is not qualified to interpret data in a medical record." *Manso–Pizarro v. Sec'y of HHS*, 76 F.3d 15, 17 (1st Cir.1996) (citing *Perez v. Sec'y of HHS*, 958 F.2d 445, 446 (1st Cir.1991); *Gordils v. Sec'y of HHS*, 921 F.2d 327, 329 (1st Cir.1990)). If "the medical evidence shows relatively little physical impairment, an ALJ permissibly can render a common-sense judgment about functional capacity even without a physician's assessment." *Manso–Pizarro*, 76 F.3d at 17; *see also Gordils*, 921 F.2d at 329 (an ALJ is not "precluded from rendering common-sense judgments about functional capacity based on medical findings, as long as the [ALJ] does not overstep the bounds of a lay person's competence and render a medical judgment"). However, "when, as now, a claimant has sufficiently put her functional inability to perform her prior work in issue, the ALJ must measure the claimant's capabilities." *Manso–Pizarro*, 76 F.3d at 17. "[T]o make that measurement, an expert's RFC [⁴] evaluation is ordinarily essential unless the extent of functional loss, and its effect on job performance, would be apparent even to a lay person." *Id.* (quoting *Santiago v. Sec'y of HHS*, 944 F.2d 1, 7 (1st Cir.1991)). "Absent a medical advisor's or consultant's assessment of the full record,⁵ the ALJ effectively substituted his own judgment for medical opinion." *Alcantara v. Astrue*, 257 Fed.Appx. 333, 334 (1st Cir.2007)

 Here, Ms. Hall put her functional inability to perform work at issue. She testified that she has cerebral palsy, cannot lift objects weighing more than ten pounds, and has weakness in her right hand. Trans. 44. She also stated that she has difficulties with fine manipulation, such as cutting food, opening jars, and picking

---

4. A claimant's "RFC" is the residual functional capacity of the claimant to perform work. *Id.* at 17.

5. As discussed below, the state agency consultants did not review the full record.

up little things. *Id.* at 44–45. Additionally, Ms. Hall explained that her ability to work was limited by her mental impairments. *Id.* at 45–46; 50–51; 54. She explained that she has problems with crowds and working with coworkers due to her anxiety issues; suffers from memory loss; has problems focusing and concentrating; and gets upset or cries when criticized. *Id.* at 445–47; 55. Ms. Hall's testimony is supported by medical evidence in the record, especially the most recent evaluations by Dr. Jessica Ruffolo, Ms. Stinson, and Dr. Cox. *Id.* at 295; 360; 364. However, there is also record evidence that is not consistent with Ms. Hall's testimony, namely the opinions of Dr. Kreiss and Dr. Litchman. *Id.* at 226–27; 311–313.

Dr. Ruffolo, Ms. Stinson, and Dr. Cox recognized Ms. Hall's limitations. Ms. Stinson noted that Ms. Hall was depressed; had thoughts of worthlessness, hopelessness, low self-esteem; and her judgment was impaired. *Id.* at 360. Dr. Ruffolo suggested that Ms. Hall receive further treatment for her severe depression and neuropsychological testing, and noted her worsening memory, increased emotional outbursts, and cognitive decline. *Id.* at 364. Dr. Cox cited her "pronounced symptoms of depression" and her impaired memory and focus, and explained that solving problems and goal-directed action essentially were beyond her capability." *Id.* at 295. Dr. Cox's diagnoses were major depressive disorder, recurrent; dependent personality disorder; and cerebral palsy. *Id.*

Contrarily, Dr. Kreiss and Dr. Litchman reported different assessments of Ms. Hall's impairments. Dr. Kreiss assigned Ms. Hall a GAF score of sixty and stated that Ms. Hall had no "obvious psychomo-

tor abnormalities," "was alert and oriented," had a "thought process [that] was linear with appropriate content." *Id.* at 227–28. Dr. Kreiss noted that "her attention and concentration were intact throughout the evaluation." *Id.* at 227. Dr. Litchman stated that Ms. Hall has "[n]o limitations. No signif[icant] deficits in recall in recent eval[uation]s," has the ability to sustain attention and concentration, "would be able to handle supervisory oversight in simple tasks," and "would be able to set minor goals effectively." *Id.* at 313.

These inconsistencies are the reason a medical expert was required. The inconsistencies in the medical evidence brought the subject matter beyond the competence of a "lay person." *See Manso–Pizarro*, 76 F.3d at 17; *see also Gordils*, 921 F.2d at 329. There is more than "little in the way of physical impairment" that the ALJ could make a common sense judgment on; there is intricate medical evidence that was inconsistent and contradicted itself. *See Manso–Pizarro*, 76 F.3d at 17. The inconsistent medical evidence put Ms. Hall's functional ability to work at issue and the ALJ was required to measure her capabilities. *See id.* Because the medical evidence is so contradictory and consists of such a wide array of opinions,[6] the medical record and Ms. Hall's inability to perform is not apparent to a lay person. *See id.* Since a medical expert did not testify, and the ALJ substituted his own judgment for medical opinion, the ALJ's opinion is not supported by substantial evidence.

## B. GAF Scores

■ The record contains several GAF scores assigned to Ms. Hall over the course of her three years of treatment. The highest GAF score, sixty, was given

---

**6.** For example, Ms. Hall's GAF scores ranged from sixty to forty and her diagnoses ranged from "severely impaired" to "moderately impaired."

by Dr. Kreiss on September 8, 2009. Trans. 228. The lowest GAF score, forty, was given by Dr. Cox on April 20, 2010. *Id.* at 295. Despite recognizing that GAF scores are "not a precise functional assessment," the ALJ used GAF scores as a basis for reconciling conflicting evidence in the record. *Id.* at 27.

GAF scores have been deemed unreliable. "It was recommended that the GAF be dropped from DSM–5 for several reasons, including its conceptual lack of clarity ... and questionable psychometrics in routine practice." *See* Am. Psychiatric Ass'n, *Diagnostic and Stat. Manual of Mental Disorders DSM–5* 16 (5th ed.2013). To clarify the appropriate reliance on GAF scores, the Social Security Administration ("SSA") released an Administrative Memorandum (identification number AM–13066, effective date July 22, 2013) that "provides guidance to all State and Federal adjudicators (including administrative law judges) on how to consider Global Assessment Functioning (GAF) ratings when assessing disability claims involving mental disorders." (ECF No. 11–2 at 6.) The Administrative Memorandum emphasizes that "GAF ratings are not standardized," explaining that "GAF is neither standardized nor based on normative data.... This limits direct comparability of GAF scores assigned by different evaluators...." *Id.* at 3. The Administrative Memorandum continues:

> Although the GAF rating is numerical, the actual number assigned can be misleading because the score does not quantify differences in function between people. For example, a GAF score of 75 does not mean a person is functioning 10 units better than a person with a score of 65, nor does a GAF of 40 indicate a person is functioning half as well as a person with a score of 80.

*Id.* Additionally, it states that "GAF ratings assigned by different clinicians are inconsistent" and "adjudicators cannot draw reliable inferences from the difference in GAF ratings assigned by different clinicians or from a single GAF score in isolation." *Id.*

Consistent with the condemnation of the GAF system, and the recent Administrative Memorandum from the SSA, it was improper for the ALJ to discredit medical evidence based on its assigned GAF score. Specifically, the ALJ improperly dismissed Dr. Cox's opinion based on the GAF score of 40, *see* Trans. 28, and ignored the fact that Dr. Cox found that Ms. Hall's "focus and memory are impaired due to stress, depression, and frequent emotional dysregulation," "[s]he has pronounced symptoms of depression," and that she "[gave] the impression of being preoccupied with depression and anger to an extent that problem solving and goal-directed action are essentially beyond her capability." *Id.* at 295. Similarly, when discussing a GAF score of 50, the ALJ noted that such a score could be "based on subjective unsubstantiated complaints." *Id.* at 27. In contrast, when discussing a GAF score of 60, the ALJ did not question its validity but stated it "indicates only moderate-non-disabling symptoms." *Id.* The ALJ's reliance on GAF scores to discredit or find credible certain medical evidence was error.

## C. Dr. Litchman's Report

 Ms. Hall argues that the ALJ should not have given "great weight" to Dr. Litchman's report because it was too old and based on an incomplete medical record, specifically, a record lacking the opinions of Christine Stinson, Dr. Ruffolo and nurse Brousseau–Pizzi, who all recently noticed a deterioration in Ms. Hall's condition. (ECF No. 5–1 at 11–18.) The Commissioner asserts that the ALJ properly gave "great weight" to Dr. Litchman's

report because the evidence submitted after Dr. Litchman's report did not support a deterioration in Ms. Hall's condition. (ECF No. 8 at 18.)

This Court finds that the ALJ unduly placed "substantial weight" on the opinion of Dr. Litchman. The ALJ's reliance on Dr. Litchman's report was unjustified for two primary reasons: Dr. Litchman did not review relevant medical evidence and Dr. Litchman's report is not supported by the record as a whole.

### i. The Ignored Evidence

The First Circuit has remanded cases where a consultant's opinion is based on an incomplete record. Notably, in *Padilla v. Barnhart*, 186 Fed.Appx. 19, 22 (1st Cir. 2006), the ALJ "disregarded the most current medical information in the record and relied exclusively on the opinions and assessments of the consulting physicians and psychologist which, in turn, were based on an incomplete medical record." The Court of Appeals held that "[t]his fact counsels against assigning controlling weight to these opinions." *Id.* In *Alcantara*, the First Circuit held that an ALJ could not give a reviewing consultant's opinion "any significant weight because it was "based on a significantly incomplete record, and it was not well justified." " 257 Fed.Appx. at 334. The Court of Appeals noted that "[a]lthough the ALJ stated that the record underwent no material change, he did not explain his analysis," and, in fact, "[t]he record repeatedly indicated that the [claimant] deteriorated." *Id.*

Here, Dr. Litchman was retained as a state agency reviewing psychologist to conduct a psychiatric review. His report was issued in May of 2010. Trans. 297, 313. His review was incomplete because he did not review the medical records from Dr. Ruffolo or Ms. Stinson, two clinicians who saw Mr. Hall most recently and identified a decline in her condition, nor did he review notes from nurse Brousseau–Pizzi, who treated Ms. Hall in 2011. *Id.* at 364, 366. 390–414. For example, Dr. Ruffolo noted Ms. Hall's extensive and rapid cognitive declines, stating,

> I recommend that Ms. Hall return for neuropsychological testing following further treatment for severe depression ... I am also concerned about Ms. Hall's reportedly worsening memory, which is apparently obvious to Ms. Hall and her family. In addition, she lacks motivation and has increased emotional outbursts. I strongly suspect that her severe OSA (Obstructive Sleep Apnea) is contributing to her cognitive declines and that severe depression and stress are also playing a role.

*Id.* at 364. Moreover, Ms. Stinson's notes show Ms. Hall's cognitive decline: she was severely depressed, anxious, and did not sleep well; had thoughts of inadequacy, worthlessness, hopelessness, pessimism, and negativity; appeared anxious and worried; exhibited signs of low self esteem, racing thoughts, and decreased interest; and that her judgment was moderately impaired, as was her insight. *Id.* at 359–60. Ms. Stinson noted that she was "also concerned about [Ms. Hall's] cognitive decline [and] wish[ed] for testing for her ( [and] her children) to go forward once she feels stronger." *Id.* at 366. In March of 2011, nurse Brousseau–Pizzi diagnosed Ms. Hall as having "very severe social phobia," "performance anxiety," and "major depressive dis[order], recurrent, mod[erate]. *Id.* at 399. Nurse Brousseau–Pizzi notes indicate that Ms. Hall's "memory loss has worsened" and Ms. Hall lost papers that she was repeatedly asked to bring. *Id.* at 397. The opinions of Dr. Ruffolo, Ms. Stinson, and nurse Brousseau–Pizzi are relevant as they show Ms. Hall's deterioration and decline.

As Dr. Litchman did not have the medical records from Dr. Ruffolo, Ms. Stinson, or nurse Brousseau–Pizzi, his review was of an incomplete record that lacked relevant evidence regarding Ms. Hall's recently deteriorating condition. The ALJ therefore should not have given Dr. Litchman's opinion great weight. In addition, the ALJ's finding that the medical notes submitted after Dr. Litchman's review neither supported a deterioration in Ms. Hall's condition, nor showed greater limitations, is flawed and erroneous.[7] Trans. 28.

### ii. The Record As A Whole

■ As noted above, Joseph Litchman, Ph.D., a state agency psychologist, conducted a review of some of the medical evidence and the ALJ gave "great weight" to his opinion of the medical record. *Id.* at 29. Opinions provided by such state agency medical consultants

> can be given weight only insofar as they are supported by evidence in the case record, considering such factors as the supportability of the opinion in the evidence including any evidence received at the administrative law judge and Appeals Council levels that was not before the State agency, *the consistency of the opinion with the record as a whole,* including other medical opinions, and any explanation for the opinion provided by the State agency medical or psychological consultant. . . .

SSR 96–6P, 1996 WL 374180, at *2 (S.S.A July 2, 1996) (emphasis added). Only in appropriate circumstances, such as when the "consultant's opinion is based on a *review of a complete case record* that includes a medical report from a specialist in the individual's particular impairment which provides more detailed and comprehensive information than what was available to the individual's treating source," will opinions from State agency consultants "be entitled to greater weight than the opinions of treating or examining sources." *Id.* at *3 (emphasis added).

The ALJ's reliance on Dr. Litchman's findings was error because Dr. Litchman's findings are not consistent with "the record as a whole." For example, Dr. Litchman opined that Ms. Hall has no significant deficits in recalling recent events, retains the ability to sustain attention and concentration for two hour spans, and would be able to set minor goals." Trans. 313. In contrast, Dr. Cox noted that her "memory is impaired," "goal directed action [is] essentially beyond her capability," and her "memory and capacity for focus are limited secondary to persistent distress and depression." *Id.* at 294–95. Dr. Ruffolo noted concerns about Ms. Hall's "worsening memory" and "increased emotional outbursts." *Id.* at 364. Ms. Stinson cited concerns about Ms. Hall's "cognitive decline." *Id.* at 366. Consequently, the ALJ's statement that "the opinion of Dr. Litchman was fully consistent with the medical evidence" is simply not supported by the evidence in the record. *Id.* 29.

A review of the entire record shows that Dr. Litchman's opinion is inconsistent with the record as a whole.[8] The ALJ therefore erred by giving "great weight" to Dr. Litchman's opinion.

---

7. During the March 4, 2014 hearing, counsel for the Commissioner conceded there was evidence in the record that Ms. Hall's condition worsened after Dr. Litchman's review, but noted that a pattern of waxing and waning was normal.

8. As explained above, the reliance on Dr. Litchman was also improper because Dr. Litchman did not review the most recent medical evidence.

### D. ALJ Failed to Consider all of the Evidence

 Not only did the ALJ rely too heavily on a report that failed to consider recent relevant medical evidence, the ALJ also failed to evaluate the most recent medical evidence. The ALJ's decision fails to mention evidence from Ms. Hall's visits with Christine Stinson or Dr. Ruffolo.[9] The ALJ's failure to consider this relevant recent medical evidence does not comport with the requirement that the ALJ weigh *all* of the evidence in the record. *See* 20 C.F.R. §§ 416.902, 416.912(b), 416.913(d), 416.945(a)(3) (emphasis added). While these two sources may not be acceptable *medical* sources pursuant to 20 C.F.R. §§ 416.902, 416.913, 416.927, they are *evidence* nonetheless, and the ALJ simply cannot ignore relevant evidence. (Emphases added.) Ms. Stinson and Dr. Ruffolo were both *"medical source[s]* capable of providing evidence about the severity and effects of impairment, as well as [ ] general source[s] of evidence." *Alcantara,* 257 Fed.Appx. at 335 (citations omitted). "The ALJ was required to weigh all of the evidence," *see id.* (citations omitted), but here, by ignoring the opinions of Ms. Stinson and Dr. Ruffolo, the ALJ failed to do so.

The ALJ's failure to consider all the evidence was erroneous and therefore the ALJ's decision was not supported by substantial evidence.

### VI. CONCLUSION

For the forgoing reasons, Ms. Hall's motion for remand (EFC No. 5) is GRANTED. The Commissioner's motion for an order affirming the decision of the Commissioner (ECF No. 8.) is DENIED. This Court REVERSES the decision of the Commissioner and REMANDS this pro-ceeding under sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.

IT IS SO ORDERED.

---

9. The ALJ does refer to page one of Exhibit 16F, a note from Ms. Stinson in July of 2011 indicating that Ms. Hall has dropped out of treatment. *Id.* at 347.